IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
BILLINGS DIVISION

|  |  |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>TANYA MARIE NAVA,<br><br>Defendant. | CR 10–134–BLG–SPW-1<br><br>ORDER |

On July 10, 2023, Defendant Tanya Marie Nava filed a motion to reduce her 262-month federal drug sentence under 18 U.S.C. § 3582(c)(1)(A). (Doc. 159; *see* Docs. 68, 85 (Judg., Amend. Judg.).) Her projected release date is May 6, 2029. *See* Inmate Locator, http://www.bop.gov/inmateloc (accessed Nov. 29, 2023). On July 11, 2023, counsel was appointed to represent the defendant. (Docs. 160, 161.) Appointed counsel filed an amended motion on September 11, 2023. (Doc. 162.) The government opposes. (Doc. 167.) For the reasons stated below, the defendant's motion is granted.

## ANALYSIS

The First Step Act of 2018 gives district courts wide discretion to reduce an existing term of imprisonment so long as a defendant first seeks relief from the Bureau of Prisons ("BOP") and the reduction: (1) is consistent with the applicable

1

policy statements of the Sentencing Commission, (2) takes into consideration the sentencing factors of 18 U.S.C. § 3553(a), and (3) is warranted by "extraordinary and compelling reasons." 18 U.S.C. § 3582(c)(1)(A); *United States v. Keller*, 2 F.4th 1278, 1284 (9th Cir. 2021) (per curiam).[1] The defendant argues that those elements are met here insofar as she is the only available caregiver for her ailing father, the BOP is unable to provide her with the necessary services to provide for her overall health and rehabilitative needs, and, if sentenced today, she would not have been designated a career offender. Because her final argument is persuasive, Nava's motion is granted.

## I.  Exhaustion of Administrative Remedies

A defendant may only file a motion for compassionate release with the district court once she has "fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier." 18 U.S.C. § 3582(c)(1)(A). Here, Nava filed a request for relief with the warden on May 7, 2023, and there is no indication

---

[1] On November 1, 2023, the Sentencing Commission amended its policy statements to further define "extraordinary and compelling reasons." *See* 2023 Amendments to the Sentencing Guidelines, Policy Statements, and Official Commentary, First Step Act—Reduction in Term of Imprisonment Under 18 U.S.C. § 3582(c)(1)(A) (effective Nov. 1, 2023) (*available at* https://www.ussc.gov/guidelines/amendments/adopted-amendments-effective-november-1-2023).

from the record that the warden responded. (*See* Doc. 159-1 at 1–2.) She has therefore exhausted the administrative remedies as required by statute.

## II. Extraordinary and Compelling Reasons

While the First Step Act does not define "extraordinary and compelling reasons," the Sentencing Commission provides explicit examples of such circumstances. *See* USSG §1B1.13. Relevant here, "[i]f a defendant received an unusually long sentence and has served at least 10 years of the term of imprisonment, a change in the law . . . may be considered in determining whether the defendant presents an extraordinary and compelling reason, but only where such change would produce a gross disparity between the sentence being served and the sentence likely to be imposed at the time the motion is filed, and after full consideration of the defendant's individualized circumstances." USSG §1B1.13(b)(6). Here, Nava argues that she has shown extraordinary and compelling reasons for reduction because she would no longer be a career offender if sentenced today.[2] That argument is persuasive.

To meet the requirements of §1B1.13(b)(6), Nava mush show that she (1) was originally given an "unusually long sentence"; (2) served at least ten years

---

[2] The government's argument focuses primarily on whether a change in career offender status should even be considered in the compassionate release context. (*See* Doc. 167 at 11–14.) The recent amendments to the Guidelines provide explicit guidance on this issue. *See* §1B1.13(b)(6), (c).

3

in prison; and (3) was subject to a change in sentencing law that means she is now serving a grossly disparate sentence. There is no dispute as to (2), as Nava has served approximately 150 months in custody. (*See* Doc. 167 at 6.) Accordingly, the analysis below focuses on the change in the career offender law and the comparative length of Nava's sentence.

Nava was convicted of one count of conspiracy to possess with intent to distribute and distribute methamphetamine in violation of 21 U.S.C. § 846, (*see* Docs. 1, 68), and ultimately found responsible for 62.4 grams of actual methamphetamine, (*see* PSR ¶ 27). But, at the time her sentencing in 2013, Nava was not sentenced under the drug guidelines at §2D1.1, but rather designated a career offender under §4B1.2(a) based on two previous convictions: possession of a sawed-off shotgun, (PSR ¶ 46), and assault on a peace officer, (PSR ¶ 47). (*See also* PSR Addendum (clarifying the underlying offenses).) Accordingly, Nava's criminal history category was VI and, with a total offense level of 34, her advisory Guideline range was 262 to 327 months. (*See* PSR ¶ 109.) She ultimately received a sentence of 262 months. (*See* Doc. 68 at 2.)

In 2013, approximately 22,000 defendants were sentenced under §2D1.1, U.S. Sentencing Commission, *2013 Sourcebook*, Table 17, and the average prison sentence for methamphetamine offenders was 93 months (median of 72 months), *id.* at Figure J. Even though career offenders were generally sentenced to longer

4

terms of incarceration, the average sentence was still only 147 months for all career offenders, *see Report to the Congress: Career Offender Sentencing Enhancements*, at 2, 24 (August 2016) (analyzing sentences from 2014), and 179 months for "crime of violence" career offenders such as Nava, *id.* at 34. Thus, at the time of sentencing, Nava's sentence was almost 8 years longer than the average career offender sentence. She has therefore shown that her original sentence was "unusually long."

Nava further argues that her sentencing disparity is even more extreme because her conviction for assault on a peace officer under Montana Code Annotated § 45–5–210 no longer constitutes a crime of violence under *United States v. Castro*, 71 F.4th 735 (9th Cir. 2023). She is likely correct and, notably, the government does not appear to disagree. (*See* Doc. 167 at 12 (failing to argue the merits of *Castro*'s application).). Section 45–5–210 provides that:

> (1) A person commits the offense of assault on a peace officer or judicial officer if the person purposely or knowingly causes:
>
> (a) bodily injury to a peace officer or judicial officer;
>
> (b) reasonable apprehension of serious bodily injury in a peace officer or judicial officer by use of:
>
>> (i) a weapon; or
>> (ii) what reasonably appears to be a weapon;
>
> (c) bodily injury to a peace officer or judicial officer with a weapon; or
>
> (d) serious bodily injury to a peace officer or judicial officer.

5

Here, Nava bit the arm of a correctional officer, (*see* PSR ¶ 47), and her conviction fell under subsection (1)(a), (*see* Doc. 169-1 at 3 (state court documents)). Thus, Nava's career offender status turns on whether § 45–5–210(1)(a) "has as an element the use, attempted use, or threated use of physical force against the person of another." USSG §4B1.2(a)(1). It does not. As discussed in the Ninth Circuit's recent decision in *Castro*, Montana's definition of "bodily injury" is "unusual" in that it "includes mental illness or impairment." 71 F.4th at 736 (quoting Mont. Code Ann. § 45–2–101(5)); *id.* at 742 ("Montana explicitly defines bodily injury more broadly than the generic definition." (internal quotation marks and alteration omitted)). Accordingly, because Nava's conviction for assault of a peace officer under (1)(a) required nothing more than causing mental anguish through nonviolent conduct, it was not categorically a crime of violence under §4B1.2(a). *See id.* at 744.

Without a career offender designation, Nava's criminal history category would be V, not VI, and her total offense level would be 29, not 34, resulting in an advisory Guideline range of 140 to 175 months. Additionally, Nava likely would have qualified for a reduction under Amendment 782, which retroactively reduced the base offense levels under §2D1.1 by two levels, resulting in an amended total offense level of 27 and a criminal history category V, making her advisory Guideline range 120 to 150 months. This Guideline calculation is then consistent

6

with the ten-year mandatory minimum to which Nava is subject. (*See* Doc. 1.) Considering that the average term of imprisonment for drug offenders with the same Guideline calculation for methamphetamine is now 107 months, Sentencing Commission, Judiciary Sentencing Information ("JSIN"), https://jsin.ussc.gov (accessed Nov. 29, 2023), Nava's current sentence of 262 months is grossly disparate from the sentence she would likely receive today.

Based on the foregoing, Nava has shown an extraordinary and compelling reason for reduction.[3]

### III. Section 3553(a) Factors

Nevertheless, demonstrating an extraordinary and compelling reason to reduce a sentence meets only one element of § 3582(c)(1)(A). To determine whether relief is appropriate, a court must also consider the federal sentencing objectives set forth in 18 U.S.C. § 3553(a). Pertinent factors include the "nature

---

[3] Nava's other grounds fail to meet this threshold. As it relates to her ailing father, while Nava is correct that there are a panoply of cases finding extraordinary or compelling circumstances in the case of an ailing parent in need of care, (*see* Doc. 162 at 9 (collecting cases)), and that her release would aid in the care of her father, she has not shown that she is the "*only* available caregiver," USSG §1B1.13(b)(3)(C) (emphasis added). Thus, as argued by the government, this reason does not provide a basis for the relief requested. (*See* Doc. 167 at 7 ("While [Nava's siblings] would likely appreciate Nava's help, such justification is inadequate to support early release.").) As it relates to adequate programming and services within the BOP, Nava has failed to specifically identify which services she has not received and, as argued by the government, has actually cited improved mental health and coursework she completed in preparation for release. (*See* Doc. 162 at 20–21.)

7

and circumstances of the offense and the history and characteristics of the defendant," the need for the sentence "to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense," to deter criminal conduct and protect the public, and to provide effective correctional treatment, including education or vocational training and medical care. *See* 18 U.S.C. § 3553(a)(1), (2). Courts may also consider the advisory guideline range and the need to "avoid unwarranted sentencing disparities" among similarly situated defendants. *See id.* § 3553(a)(4), (6).

Nava was involved in the distribution of methamphetamine in eastern Montana in 2009. (*See* PSR ¶¶ 11–20.) While her offense involved only 62 grams of actual methamphetamine, (*see* PSR ¶ 21), her Guideline range was driven by her expansive criminal history. (*See* PSR ¶¶ 37–61). As noted by the government, "Nava is now almost 50-years-old[] and has been involved in the criminal justice system since she was 18." (Doc. 167 at 4.) Her previous convictions are for both state and federal offenses and include drug and gun offenses, as well as two different assaults on a peace officer. Accordingly, even without the career offender designation, Nava's criminal history is a category V. (*See* PSR ¶ 55.)

Nava argues, however, that she has engaged in numerous educational and rehabilitative programs while in custody that have provided skills that will benefit her in seeking housing and employment upon release and demonstrate a positive

8

change in her behavior. (Doc. 162 at 20–21.) Indeed, BOP records show that she has enrolled in numerous courses over the years, including a number of professional and life-skills courses. (*See* Doc. 164 at 41–42.) However, Nava's rehabilitative efforts must be weighed against both her prior behavior on supervision and her disciplinary record while in custody. Neither is particularly positive. Nava performed poorly on supervision in the past, (*see* PSR ¶ 46 (sentenced to an additional 24 months on revocation)), and has been sanctioned for her in-custody conduct, including instances of fighting with other inmates, (*see* Doc. 164 at 37–40). As recognized by Nava herself, the "long-standing patterns of abuse, neglect, battering, chemical dependency, and . . . physical intimidation" by her family, in addition to her attendant mental health issues, have not set her up to succeed in the community. (Doc. 162 at 19 (quoting PSR ¶66).)

Moreover, the government insists that Nava does not qualify for compassionate release as she is danger to community as defined under 18 U.S.C. § 3142(g). *See* USSG §1B1.13(a)(2).[4] Section 3142(g) lists four factors a court must consider an assessing danger: (1) the nature and circumstances of the offense charged; (2) the weight of the evidence against the defendant; (3) the history and

---

[4] Prior to the 2023 Guidelines amendment, dangerousness under § 3142(g) was not a binding policy statement and was therefore considered only under the umbrella of § 3553(a). (*See* Doc. 162 at 26); *United States v. Bigman*, 2023 WL 3727476, at *3 (D. Mont. May 30, 2023). While there is still an overlap with § 3553(a), a finding as to dangerousness is now required. *See* USSG §1B1.13(a)(2).

9

characteristics of the defendant, including the defendant's character, physical and mental condition, family and community ties, past conduct, history relating to drug and alcohol abuse, criminal history, and record concerning appearance at court; and (4) the nature and seriousness of the danger to any person or the community that would be posed by the person's release. 18 U.S.C. § 3142(g)(1)–(4). As discussed above, Nava's history raises concern here. While the present offense involved a relatively minor amount of methamphetamine and no weapons, Nava's criminal history contains violent offenses and at least one firearm. (*See* PSR ¶ 46.) Nava persuasively argues, however, that this analysis is somewhat overstated in the context of the present low-level drug offense and dated given how long she has already served in prison and her current age. Indeed, the Sentencing Commission has found that incarceration rates of more than 120 months have a deterrent effect, Sentencing Commission, *Length of Incarceration and Recidivism*, at 4 (Apr. 2020), and older offenders are substantially less likely to recidivate than younger offenders, Sentencing Commission, *The Effects of Aging on Recidivism Among Federal Offenders*, at 3 (Dec. 2017). Thus, while a necessary consideration, Nava is not considered so dangerous as to disqualify her for relief.

Ultimately, it is the disparity of Nava's sentence that drives the § 3553(a) analysis. Put simply, Nava would not have received her current sentence if sentenced today, even considering her extensive criminal history. At this point,

Nava has served approximately 150 months. That equates to a high-end Guideline sentence under the reduced calculation discussed above. Having weighed the § 3553(a) factors—specifically balancing Nava's criminal history against the potential sentencing disparity—such a sentence is appropriate here.

## CONCLUSION

Accordingly, IT IS ORDERED:

1. Nava's motion for compassionate release under 18 U.S.C. § 3582(c)(1)(A) (Docs. 159, 162) is GRANTED.

2. As of the date of this Order, Nava's sentence is REDUCED to time served.

3. This Order is STAYED for up to 21 days to allow the United States Probation Office time to verify Nava's residence and establish a release plan, with preference for placement in a pre-release center or home confinement; to make appropriate travel arrangements; and to ensure Nava's safe release.

4. Nava shall be released as soon as a residence is verified, a release plan is established, and appropriate travel arrangements are made.

5. If more than 21 days are needed to accomplish Nava's release, the United States must so notify the Court and demonstrate good cause why the stay of this Order should be extended.

6. The United States Probation Office shall review Nava's conditions of

supervised release. If modifications are needed, the Probation Office shall notify the Federal Defenders of Montana. Counsel will be appointed to represent Nava.

7. Nava must provide the Court with the complete address where she will reside upon release.

DATED this 30th day of November, 2023.

Susan P. Watters, District Judge
United States District Court